UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL RAK,

               Plaintiff,           Civil Action No. 12-13801
                                      Honorable Sean F. Cox
                                        Magistrate David R. Grand

     v.

SAXON MORTGAGE SERVICES,
INC. and OCWEN LOAN
SERVICING, LLC,

               Defendants.

_____/

**REPORT AND RECOMMENDATION TO GRANT IN PART
AND DENY IN PART DEFENDANT SAXON MORTGAGE
SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT [29]**

## I.    RECOMMENDATION

Before the Court is Defendant Saxon Mortgage Services Inc.'s ("SMSI") Motion for Summary Judgment [29], referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [32]. For the following reasons, the Court recommends that the motion be granted in part and denied in part.

## II.    REPORT

### A.    Background

#### 1.    *Factual*[1]

On January 18, 2002, Plaintiff Cheryl Rak obtained a mortgage loan (the "Loan") from Novastar Mortgage, Inc. ("Novastar") in the amount of $189,000 for property located at 2013 Wiggins Road, Fenton, MI 48430 (the "Property"). She executed an adjustable rate note (the

---

[1] The facts as stated herein are not in dispute unless otherwise noted.

"Note") in favor of Novastar also on that date.  As security for the Loan, Rak granted Mortgage Electronic Registration Systems, Inc. solely as nominee for Novastar and Novastar's successors and assigns, a mortgage on the Property.  Defendant SMSI began servicing the Loan years later, on November 1, 2007.

Rak ultimately defaulted on the Loan and applied for a loan modification pursuant to the Home Affordable Modification Program ("HAMP") in 2009.  She then signed a HAMP trial period plan where she would make three trial period payments while her application was reviewed.  Her first payment of $728.50 was due on September 1, 2009.  She was also required to make payments in the same amount on October 1 and November 1, 2009, respectively.  Rak made timely payments for September through November.  (Mot. Ex. P at 2).

On December 7, 2009, SMSI sent Rak a letter indicating that the trial period would be extended, and that she was to make two additional trial period payments while SMSI continued to process her loan modification application.  Prior to that December 7, 2009 letter, on November 30, 2009, Rak made two payments that, when combined, totaled her December trial period payment amount of $728.50.  (Mot. Ex. H; P).

On December 11, 2009, SMSI sent Rak a HAMP loan modification agreement, which Rak signed on or about December 23, 2009.  The HAMP modification had an effective date retroactive to December 1, 2009, and required Rak to make a payment for December in the amount of $825.53.  On December 21, 2009, Rak made a payment of $96.73, which, when added to the amount she had previously tendered for December, resulted in the correct full payment amount under the HAMP modification.  (Mot. Ex. H).  Thereafter, Rak made full HAMP modification payments, on or around the fifteenth of each month, beginning January 2010.  On January 21, 2010, per Rak's request, SMSI sent her a complete copy of her payment history on

her mortgage Loan.  (Mot. Ex. W).  On May 28, 2010, SMSI sent RAK an amendment to the HAMP modification that altered only the term of the interest rate (lowering it).  (Mot. Ex. I). Rak signed the amendment.  *Id.*

Rak testified at her deposition that in May 2011 she called SMSI's speed pay system and was informed that she had missed a payment and owed two payments.  (Rak Dep. at 45-46).  On June 21, 2011, Rak faxed a letter to SMSI challenging the application of her previous payments. (Mot. Ex. M).  In her letter, she detailed the payments she had made and how they should have been applied, requested help to fix her account, and lamented that she had been not made aware of any error until May 2011 when she received a notice to accelerate her Loan.  (*Id.*).  She stated in her letter that she had been very upset trying to remedy the situation.  (*Id.*).  On June 27, 2011, Rak supplemented her June 21 letter with another fax that included a copy of her bank account statement showing proof of a September 2009 payment.  (Mot. Ex. N).

On July 7, 2011, SMSI acknowledged receipt of Rak's correspondence and responded that after reviewing the account, it had determined that there were no errors in the processing of Rak's modification and that she currently owed a June 2011 payment in the amount of $809.09.[2] (Mot. Ex. O).  The letter further informed Rak that if she had any questions, she could contact SMSI's customer service department at a toll-free number.  (*Id.*).  In addition, the letter was signed by a "Jensen Stewart" who was a "Senior Escalation Resolution Advocate," and provided Stewart's phone number and extension.  (*Id.*).  On August 31, 2011, SMSI sent another letter to Rak, this time detailing its review of the application of her Loan payments.  (Mot. Ex. P).  It documented payments made during the trial period as follows:

---

[2] An escrow account review of Rak's account in November 2010 reduced her monthly payment under the HAMP modification to $809.09 beginning December 1, 2010.  (Mot. Ex. P).

| Posting Date | Payment Amount | Month Paid |
|---|---|---|
| 8/19/2009 | $728.50 | September 2009 |
| 9/29/2009 | $728.50 | October 2009 |
| 10/28/2009 | $728.50 | November 2009 |
| 11/30/2009 | $728.50 Payment was short by $96.73 | December 2009 |
| 12/21/2009 | $96.73 | December 2009 |

(*Id.*).  It documented her payments after the completion of the modification as all having been paid, until April 2011 when it documented the following:

| Posting Date | Payment Amount | Month Paid |
|---|---|---|
| 4/16/2011 | $809.09 | April 2011 |
| 6/16/2011 | $809.09 | May 2011 |
| 7/18/2011 | $809.09 | June 2011 |

(*Id.*).  The letter then stated that "Your account is due for the July and August 2011 payments for the total of $1618.18, plus late fees and charges for a total of $2147.17.  You currently have a suspense balance of $96.73 you can use to bring your account current."  (*Id.*).  The letter further included a note that Rak could contact the customer service department with questions at a toll-free number.  (*Id.*).  The letter was not signed by a particular individual, but by the "Modification Fulfillment Department."  (*Id.*).

On January 31, 2012, Rak sent SMSI another letter relating to her May 2011 payment. (Mot. Ex. Q).  In the letter, which she entitled "Saxon Qualified written request," Rak stated that she was still seeking to have SMSI correct her account for the alleged missed May payment, of which Rak alleged she had previously provided proof.  (*Id.*).  She claimed having made a number of phone calls to SMSI with no response and that the dispute had caused problems with her credit report which had in turn possibly caused her lost job opportunities.  (*Id.*).  SMSI acknowledged receipt of the January 31 letter on February 3, 2012.  (Mot. Ex. R).  On March 22, 2012, SMSI responded that after investigation, it had located the missing May 2011 payment and applied it appropriately.  (Mot. Ex. S).  However, the letter showed the May payment being

4

applied to the April 2011 bill.  (*Id.*).  It further had adjusted its documentation of all previous and subsequent payments to reflect each one having been paid a month late:

| Posting Date | Payment Amount | Month Paid |
|---|---|---|
| January 17, 2011 | $809.09 | December 2010 |
| February 16, 2011 | $809.09 | January 2011 |
| Mach 16, 2011 | $809.09 | February 2011 |
| April 16, 2011 | $809.09 | March 2011 |
| May 17, 2011 | $809.09 | April 2011 |
| June 16, 2011 | $809.09 | May 2011 |
| July 18, 2011 | $809.09 | June 2011 |
| August 31, 2011 | $809.09 | July 2011 |

(*Id.*).  The letter informed Rak to direct any questions she may have to "Saxon" at a toll free number, or to speak with a customer service representative at that number.  (*Id.*).  The letter was signed by Sarah Powell, but did not include a telephone number for her.  (*Id.*).

On March 12, 2012, SMSI sent Rak a letter informing her that it was transferring service of her mortgage to Ocwen Loan Servicing ("Ocwen") effective April 2, 2012.  (Mot. Ex. L).  On March 22, 2012, SMSI sent Rak another letter again stating that after review it had corrected the payment history to reflect that an April 2011 payment was posted on May 17, 2011.  (Mot. Ex. S).  However, it continued to note, as above, that all of her payments were one month late.  (*Id.*)

On April 2, 2012, SMSI transferred the Loan to Ocwen, and in doing so communicated to Ocwen that Rak's last payment was made in September 2009.  At the time of transfer, SMSI had reversed all of the payments Rak had made since September 2009 and placed them in a suspense account.  As a result, Ocwen then applied those funds, more than $23,000, from the suspense account to over $20,000 in interest that it calculated had accrued retroactive as a result of its belief that no payments had been made since September 2009.  (Resp. Ex. Y at 6).

On April 17, 2012, Rak sent a letter to SMSI alleging that it had failed to properly apply one of her payments and that her HAMP modification was not being honored by Ocwen.  (Mot.

Ex. T).  She further "disput[ed] any late payments that are being reported from December of 2009 to the present," and requested "a complete payment history," "a complete history of charges," "a breakdown of any amount of claimed arrears on delinquencies," and "an explanation of how any amounts claimed due or in arrears were calculated." (*Id.*).  Rak stated that she was seeking these documents because she "believe[d] there are accounting errors regarding how these payments were credited and there are also errors regarding charges, late fees and other finance charges." (*Id.*).  Rak informed SMSI that she was upset with how SMSI had serviced her Loan, including how it lost one payment and refused to apply another. (*Id.*).  She stated that her letter was "a qualified written request." (*Id.*)

On April 27, 2012, SMSI responded to Rak in a letter stating that on "April 2, 2012 this Loan was service released to Ocwen Loan Servicing, LLC, therefore we are not able to respond to your inquiry," and directed her to send any future correspondence about her Loan to Ocwen, and providing an address and telephone number for them.  (Mot. Ex. Y).  The letter was unsigned and did not provide the name or contact information for anyone from SMSI that Rak could contact.  (*Id.*).

### 2.  *Procedural*

On August 28, 2012, Rak filed the instant action, alleging violations of the Real Estate Settlement and Procedures Act, codified at 12 U.S.C. § 2605 ("RESPA"), the Fair Debt Collection Practices Act, codified at 15 U.S.C. § 1962 ("FDCPA"), and the Fair Credit Reporting Act, codified at 15 U.S.C. § 1681 ("FCRA"), against both SMSI and Ocwen, as well as a number of state and common law violations.  [1].  The District Court declined to exercise pendant jurisdiction over the state law claims and dismissed them.  [4].  Subsequently, Rak dismissed her FDCPA claim against SMSI [25], dismissed Ocwen from the action [42], and, during briefing of

the instant motion, dismissed her FCRA claim against SMSI.  [37 at 24].  Thus, all that remains pending is Rak's RESPA claim against SMSI premised on the three written requests (from June 2011, January 2012 and April 2012) detailed above.[3]  SMSI moves for summary judgment on Rak's RESPA claim, arguing that certain of her letters did not meet the standard for being qualified written requests ("QWR"), which is a prerequisite to any potential RESPA liability. [29].  In the alternative, SMSI argues that to the extent any of Rak's correspondence did meet that standard, it was properly and timely responded to.  Finally, SMSI argues that even if there was a violation of RESPA, Rak has not sufficiently pleaded damages, which is an essential element of a RESPA claim.  A hearing was held on this motion on November 13, 2013, where both parties presented argument.  After the hearing, the parties were invited to submit supplemental briefing on the issue of damages, which both parties did.  [44, 45].  The matter is now ripe for resolution.

**B.**     **Analysis**

      *1.*     *Legal Standard*

RESPA outlines a loan servicer's duty to respond to borrower inquiries:

      * * *

      (2) Action with respect to inquiry.  Not later than 60 days[4] (excluding

---

[3] After the District Court dismissed the pendant state claims, Rak brought a case in state court against SMSI and Ocwen alleging a breach of contract regarding the HAMP modification, as well as several other state and common law claims.  [Case No. 13-13879].  SMSI removed the case to this Court and it is considered a companion case to this one.  A motion to dismiss was filed in that case on October 25, 2013 [No. 13-13879, Doc# 25], which was referred to this Court for report and recommendation and is currently scheduled for hearing on February 11, 2014.  [*Id.* Doc# 15, 16].

[4] In 2010, the Dodd Frank Wall Street Reform and Consumer Protection Act shortened this period to 30 days, but during the time frame in question here, the period was 60 days.  *See* Pub. L. 111-203, §1463(c)(2) (substituting "30 days" for "60 days" in introductory provisions) (effective earlier of January 21, 2013 or date final regulation implemented of which none had

legal and public holidays, Saturdays and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes
>
>> (i) a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
>>
>> (ii) the name and telephone number of an individual employed by, or the office or department of, the service who can provide assistance to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes
>
>> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>>
>> (ii) the name and telephone number of an individual employed by, or the office or department of, the service who can provide assistance to the borrower.

12 U.S.C. § 2605(e). Under Section § 2605(i)(2), a servicer "means the person responsible for servicing a loan." 12 U.S.C. § 2605(i)(2). Servicing means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan." 12 U.S.C. § 2605(i)(3). Under Section § 2605(e)(1)(B), a QWR is:

> written correspondence, other than notice on a payment coupon or other

---

been implemented as of November 2012 (*Houston v. U.S. Bank Home Mortg. Wisconsin Servs.*, 505 Fed. Appx. 543, 547(6th Cir. 2012)).

payment medium supplied by the servicer, that –

>> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

>> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. §2605(e)(1)(B).  However, "[a] written request does not constitute a qualified written request if it is delivered to a servicer more than 1 year after either the date of transfer of servicing or the date that the mortgage servicing loan amount was paid in full, whichever date is applicable."  24 C.F.R. § 3500.21(e)(2)(ii).

Section 2605(f) of RESPA governs damages arising from violations of its provisions:

> Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

> (1) Individuals – In the case of any action by an individual, an amount equal to the sum of –

>> (A) Any actual damages to the borrower as a result of the failure; and

>> (B) Any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

12 U.S.C. § 2605(f).

>> 2.    *June 2011 and January 2012 Written Requests*

Apparently accepting without argument that Rak's June 2011 or January 2012 correspondence constituted a QWR, SMSI argues that it did not violate RESPA with regard to either request, but instead timely and properly responded to them.[5]  Rak argues that SMSI

---

[5] Both parties lump together the two separate requests Rak sent in June 2011 such that they may be treated by SMSI as one request.

violated RESPA with regard to both the June 2011 and January 2012 requests because it failed to timely correct her account as she claims was required by 12 U.S.C. § 2605(e)(2)(A).

Contrary to Rak's position, RESPA lists timely correction of an account as only one of three means by which a servicer may satisfy its *statutory* obligation of responding to a QWR. As outlined above, when presented with a QWR, a servicer may satisfy its RESPA obligation by: (1) making appropriate corrections in the account or providing the information requested; (2) investigating and providing the borrower with a written explanation why the servicer believes the borrower's account is accurate as-is; or (3) investigating and providing the borrower with a written explanation why the information requested was not available. Clearly, the third alternative only applies where the borrower's QWR seeks documentation or information. Here, where Rak's request sought a correction to her account, SMSI could either correct her account, or provide her with an explanation as to why it believed her account was presently accurate. SMSI chose to do the latter.

Rak seems to argue that because SMSI was ultimately proven wrong – that it had not properly accounted for all of her payments – that its responses to her inquiries were deficient under RESPA. But *RESPA* does not require that an investigation reach an accurate conclusion,[6] and Rak offers no support for the claim that a response from a creditor that does not accurately reflect the true state of the account as borne out by later investigation violates RESPA.

The statute simply requires that the servicer explain the "reasons for which the servicer believes the account of the borrower is correct *as determined by the servicer*." 12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added). SMSI's responses to Rak's June 2011 and January 2012 QWRs stated that it investigated her claims and, in the case of the June 2011 request, determined

---

[6] Of course, a servicer's inaccurate accounting of a borrower's payments may well expose it to liability under myriad other legal theories.

(allegedly incorrectly) that its accounting was correct and, in the case of the January 2012 request, partially corrected Rak's account and determined (again, allegedly incorrectly) that the remainder of its accounting was correct. This was all SMSI was required to do under RESPA, and thus no violation occurred with regard to these responses. *See Banayan v. OneWest Bank F.S.B.*, No. 11-0092, 2012 U.S. Dist. LEXIS 35301, *17-19 (S.D. Cal. Mar. 14, 2012) (servicer complied with RESPA when provided borrower with statement of reasons it believed account was correct, despite fact that borrower did not agree with those reasons). Accordingly, the Court recommends granting SMSI's motion for summary judgment with respect to Rak's June 2011 and January 2012 QWRs.

### 3.    *April 17, 2012 Written Request*

SMSI makes four arguments why it did not violate RESPA with regard to Rak's April 17, 2012 written request. First, SMSI argues that the request did not relate to "servicing" as required by RESPA. Second, SMSI argues that RESPA only applies to "servicers," which it allegedly was not as of the date of Rak's April 17, 2012 correspondence (as the Loan had already been transferred to Ocwen as of April 2, 2012). Third, SMSI argues that Rak's letter was duplicative of prior inquiries such that it was not required to respond under RESPA. Finally, SMSI argues that its response, which informed Rak that it was no longer the servicer and to direct all inquiries to Ocwen, satisfied any obligations it had under RESPA. The Court considers each argument in turn.

First, the Court finds that Rak's April 2012 correspondence did relate to servicing, as required by RESPA. RESPA defines servicing as "receiving any scheduled periodic payment from a borrower pursuant to the terms of any loan." 12 U.S.C. § 2605(i). In her letter, Rak clearly states that she is "disputing any late payments that are being reported from December of

11

2009 to the present," and requests that SMSI send her, in pertinent part:

> 1)      a complete payment history, including but not limited to the dates and amounts of ALL the payments made on the loan to date;
>
> 2)      a complete history of charges, including, but not limited to the dates and amounts of ALL the charges made on the account to date, noting any credits to principal, any credits to interest, amounts placed in escrow and paid from escrow;
>
> 3)      a breakdown of any amount of claimed arrears on delinquencies;
>
> 4)      an explanation of how any amounts claimed due or in arrears were calculated, including, but not limited to a reconciliation of the loan amortization with the disclosures provided;
>
> * * *
>
> 13)      a history of all late charges and penalties, a written explanation as to why such charges accrued; . . .

(Mot. Ex. T at 3-4). There is no question that these requests, all of which are directed at SMSI and involve the way SMSI applied Rak's mortgage loan and HAMP modification payments relate to the "servicing" of the Loan and thus her correspondence constitutes a QWR under RESPA. *See Sovereign Bank v. Sturgis*, 863 F. Supp. 2d 75, 105 (D. Mass. 2012) (finding that requests for itemized statement of charges and itemized statement of late fees "fit precisely within the ambit [of servicing] defined by the statute.").

Next, the Court disagrees with SMSI that it was not obligated to respond to Rak's request simply because it was no longer servicing her mortgage as of the date of her request – April 17, 2012. Regulation Z, which governs RESPA, states that "A written request does not constitute a qualified written request if it is delivered to a servicer more than 1 year after either the date of transfer of servicing . . ." 24 C.F.R. § 3500.21(e)(2)(ii). The most reasonable interpretation of this provision is that a borrower has one year after the servicing transfer date to send to a QWR to her transferor servicer. SMSI's contrary interpretation fails in two respects. First, SMSI's

12

interpretation would mean that a transferee servicer could only receive a QWR within its first year of becoming a servicer – an illogical result.  *See Campiglia v. Saxon Mortg. Servs.*, Inc., 2010 WL 725560, at *3 (N.D. Cal. Mar. 12, 2010) (noting that application of the statute to subsequent loan servicers "would leave a plaintiff with no RESPA remedy as long as a servicer's [RESPA violation] occurred more than one year after a servicer assumed responsibility for a loan" and that such an interpretation "could not have been what Congress intended").  Second, SMSI's interpretation arguably would impermissibly require the Court to ignore the words "more than 1 year" in the regulation, as if it instead stated, "A written request does not constitute a qualified written request if it is delivered to a servicer [] after either the date of transfer of servicing…"  *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) (Court must "giv[e] effect to each word [in a statute] and mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (quoting *Lake Cumberland Trust, Inc. v. U.S. E.P.A.*, 954 F.2d 1218, 1222 (6th Cir. 1992)).  Indeed, if the Court were to accept SMSI's interpretation, the need for the regulation would be obliterated; if the law were that any correspondence delivered at any time after the servicing transfer did not constitute a QWR, the regulation could have either so stated, or the regulating body could simply have declined to issue a regulation on the topic, as by definition a servicer is no longer a servicer once a loan has been transferred.  The fact that this regulation does appear here shows an intention that correspondence delivered to the prior servicer within one year of the servicing transfer does constitute a QWR.  Thus, a prior servicer receiving a QWR within that period of time is bound to respond to it as it would any other QWR under RESPA.  This makes sense because otherwise a servicer could avoid RESPA liability for its own prior actions simply by unilaterally transferring the servicing responsibilities to another entity even though that new

entity might not be in a position to address the borrower's issue.[7]   Leaving a borrower without

any recourse under the statute could not be what Congress intended.   Because it is undisputed

that SMSI received Rak's April 17, 2012 letter well within one year of the servicing transfer,

SMSI's argument that it did not have a duty under RESPA to respond to that QWR is unavailing.

　　　SMSI next argues that it had no obligation to respond to Rak's letter because it was

duplicative of her prior correspondence.   SMSI points to the fact that it had previously tendered

to Rak details outlining its position on her HAMP modification and copies of her payment

history in January 2012 and March 2012.   In support of its position, SMSI cites *Hawkins-El v.*

*First Am. Funding*, 891 F. Supp. 2d 402 (E.D.N.Y. 2012).   In that case, in response to the

plaintiff's loan being transferred between servicers and then his being found in default for failure

to pay, the plaintiff sent a QWR alleging that he did not have such a loan, was not the person

identified by the servicer, and that he had not received a "good-bye" letter from the prior

servicer.   *Id.* at 404-406.   The servicer responded to the first request with copies of the note and

mortgage, the agreement assigning the mortgage, and the good-bye letter previously sent to the

plaintiff by the prior servicer.   *Id.*   Despite this, the plaintiff sent at least three additional letters

all alleging the same facts as his original one.   *Id.*   The court found that the servicer did not

---

[7] Neither party cited any case law on this issue in their opening briefs.   While the Court's own
inquiry found very little case law on this issue, it notes the case of *Manzano v. MetLife Bank*
*N.A.*, 2011 WL 3420822, at *3 (E.D. Cal. Aug. 3, 2011), which described Regulation Z as a
"one-year limitation [which] applies only to prior servicers from whom an aggrieved borrower
seeks information."   (Citing *Campiglia*, 2010 WL 725560, at *3, *supra*; *Tacheny v. M & I*
*Marshall & Ilsley Bank*, 2011 WL 1657877, at *6 n. 4 (D.Minn. Apr. 29, 2011) (statute bars
characterization of request as QWR when request was sent to prior servicer more than one year
after transfer); and *Brunson v. Am. Home Mortg. Servicing*, 2010 WL 1329711, at *5 (D.Utah
Mar. 30, 2010) (same)).   In its reply brief, SMSI did cite *Johnson v. BNC Mortg. Corp.*, No. 09-
14717, 2010 WL 3515800, at *4 (E.D. Mich. Sept. 8, 2010), which ruled that once a servicer
transferred its servicing to another entity it "did not have any duty to respond" to what otherwise
would have been a QWR.   This Court declines to follow *Johnson*, which is not binding precedent
and which did not mention or analyze Regulation Z, for the reasons stated above.

violate RESPA by failing to respond to every one of the plaintiff's subsequent requests because "these letters raised essentially the same dispute described in his initial letter," and "[t]here would have been little, if any, benefit for [the servicer] to continue to send the same information following every letter sent by [the plaintiff.]"  *Id.* at 409; *see also Bates v. JP Morgan Chase Bank N.A.*, 12-cv-43, 2013 U.S. Dist. LEXIS 152155, *19-20) (M.D. Ga. Nov. 5, 2012) (complete *and correct* responses supplied obviated need for additional responses to identical inquiries).

In contrast here, Rak's April 2012 correspondence was anything but a mirror image of her prior QWRs.  In her April 2012 letter she specifically disputed not only the application of her payments by SMSI, but the way SMSI transferred her loan to Ocwen and Ocwen's failure to abide by the terms of the HAMP modification.  In addition, even if the only portion of Rak's letter that could be considered as relating to servicing by SMSI was the dispute of the application of her payments, the Court finds that her April 17, 2012 request for information relating to correction of her account is not analogous to the repeated correspondence of the plaintiff in *Hawkins-El*.  Here, after previously asserting that it had correctly applied her payments in its August 2011 response to her June 2011 QWR, (Mot. Ex. P), SMSI subsequently reinvestigated Rak's allegations of misapplied payments based on her January 2012 QWR and discovered that it had in fact misapplied a payment.  (Mot. Ex. R).  However, the "correction" made by SMSI actually generated another mistake, this time apparently involving the "make-up" payment from December 2009.  Whereas its previous response from August 2011 had found that Rak's payments had been current for all of 2010 (with payments being made on the 15th of the month for the month due), SMSI's March 2012 accounting, while fixing one lost payment for May of 2012, reflected that her payments were still past due because she had already been a month

15

behind at least as early as December 2010 (the earliest date the response letter reflected). (Compare Mot. Ex. P, R).  Thus, Rak's request for additional information regarding her payments to date and her challenges to the way payments were applied to her account was not simply a repeat of her earlier requests, but a genuine dispute regarding SMSI's most recent new accounting of her payments.  As such, SMSI had an obligation to respond to Rak's QWR.

Finally, SMSI argues that the response it did issue, advising Rak that it was no longer the servicer on her loan and providing her with Ocwen's information for her further inquiries, was sufficient under RESPA.  The Court disagrees.  Rak's letter requested two things – correction and information regarding her account.  The Court has already determined that this letter was a QWR and that SMSI had an obligation to respond to it under RESPA.  Therefore there were only three ways SMSI could respond: (1) correct the account or provide the information requested; (2) explain why the account was correct; or (3) explain why the information requested was not available.  Here, SMSI did none of these things.  It failed to correct Rak's account or explain why her account was accurate as stated.  It further failed to provide her with the information she requested or explain why that information could not be provided.  It simply stated that it was no longer the servicer of her loan and as such it could no longer respond to her inquiries.  This was insufficient under RESPA.  Additionally, SMSI was obligated to provide Rak with "the name and telephone number of an individual employee, or the office or department of, the servicer who can provide assistance to the borrower." 12 U.S.C. § 2605(e)(2)(A)-(C).  Because the Court has already determined that SMSI was required to respond to Rak's QWR during the one-year period after transfer of service, SMSI was also required to provide a response with its own contact information, not Ocwen's.

SMSI's failure to properly respond to Rak's April 17, 2012 QWR, despite a duty to do

16

so, means that Rak's RESPA claim based on that QWR may proceed, provided that she has at least raised a material question of fact as to damages. The Court now turns to that issue.

### 4.   Damages

The only remaining question is whether Rak has properly pleaded and shown damages as required by RESPA. Under RESPA, the only damages recoverable are actual damages, except in cases of "a pattern or practice of noncompliance" where statutory damages are permitted. 12 U.S.C. § 2605(f). Rak has not alleged a pattern or practice here. Thus, in order to recover for a violation of RESPA, she needs to allege and show actual damages. Actual damages may take the form of either economic damages or non-economic damages. Here, Rak claims she has shown both, while SMSI counters that she has sufficiently shown neither. The Court agrees with Rak.

Rak argues that she has sufficiently shown economic damages in the form of a "lost" payment of $809 and the resulting interest and late charges that resulted from it. SMSI argues that there was no "lost" payment and even if there was, Rak has failed to explain how SMSI's failure to investigate and respond to her QWR is causally related to the lost payment. Here, there appear to be two allegations regarding a lost payment. The first involves the payment of $96.73 made by Rak in December 2009, which SMSI held in a suspense account through the remainder of its servicing of her loan. The second was the May 2011 payment that Rak sought to be applied in her January 2012 QWR. The Court finds that SMSI's prior response to that QWR properly accounted for the missing May 2011 payment, (Mot. Ex. R), but that Rak has at least raised a question of fact as to whether its failure to properly respond to her April 2012 QWR regarding the application of the December 2009 payment caused her to suffer actual economic damage.

The recent similar Sixth Circuit case of *Marais v. Chase Home Finance LLC*, 736 F.3d

17

711 (6th Cir. 2013), is instructive.  In that case, Marais sent a QWR to Chase (her loan servicer) requesting, among other things, a breakdown of charges accrued on the account and disputing late fees and other charges based on what she believed to be an improper refusal of a HAMP modification.  *Id.* at *2.  Chase's response, while supplying some information, did not supply other information, and did not provide information regarding the correctness of Marais' account.  *Id.* at *3.  Marais filed suit, alleging that Chase had failed to properly apply approximately $800 worth of payments, instead keeping these payments for its own benefit.  *Id.* at *4.  Chase moved to dismiss the claim on the pleadings.  *Id.*  It did not deny that its responses violated RESPA, but argued that Marais' allegations of damages were insufficient to state a claim upon which relief could be granted.  *Id.* at *23-24.  The district court agreed with Chase, but the Sixth Circuit reversed, holding sufficient Marais's allegations that Chase's failure to adequately respond to her QWR resulted in its continued misapplication of her payments and the incurring of actual damages in the amount of the money Chase converted, as well as interest.  *Id.* at *24-29.  The Sixth Circuit held that a reasonable inference could be drawn from these allegations that "because Chase (undisputedly) failed to correct or investigate the misapplied payments, Marais paid interest on a higher principal balance than she should have."  *Id.* at *24.

Here, Rak makes similar allegations that SMSI's failure to investigate and properly respond to her April 2012 QWR alleging misapplication of her payments since December 2009 resulted in economic damages.  The evidence provided by both parties at least raises a question of fact as to whether SMSI failed to properly apply the $96.73 payment to Rak's December 2010 payment, and instead improperly kept it in a suspense account until it transferred the servicing of her loan to Ocwen in April 2012.  (Mot. Ex. S).  If Rak is correct – and SMSI has not shown that she is not – this act resulted in Rak paying more interest than she should have over the course of

18

a year and a half, which is cognizable as a pecuniary damage under RESPA.  *See* Marais, 736

F.3d at 24 ("because Chase (undisputedly) failed to correct or investigate the misapplied

payments, Marais paid interest on a higher principal balance than she should have").[8]

Furthermore, the Court finds that Rak has at least raised a question of fact that she

suffered non-economic damages as a result of SMSI's conduct.  In order to prove non-economic

damages, a plaintiff must proffer "specific evidence to establish a causal link between the

financial institution's violation and [her] injuries."  *McLean v. GMAC Mortgage Corp.*, 398 Fed.

Appx. 467, 471 (11th Cir. 2010).  "Conclusory allegations of actual damages are not sufficient."

*Dunn-Mason v. JPMorgan Chase Bank, N.A.*, No. 11-cv-13419, 2013 U.S. Dist. LEXIS 157702,

\*32 (E.D. Mich. Sept. 25, 2013) *adopted by* 2013 U.S. Dist. LEXIS 156694 (E.D. Mich. Nov. 1,

2013).

Rak's complaint alleges that she suffered both economic and non-economic damages as

the result of SMSI's RESPA violation.  (Cplt. ¶ 45).  In her affidavit supporting her opposition to

SMSI's instant motion, she avers:

---

[8] SMSI argues that Rak's November 30, 2009 payments under the trial period, as well as her
$96.73 make-up payment, were not required to be applied to her payment under the HAMP loan
modification.  That argument lacks merit.  The undisputed facts are that Rak was required to
make trial payments through November 2009.  When the end of that month came, she had not
received additional correspondence regarding her HAMP modification.  She could reasonably
have inferred then that in order to continue her HAMP modification eligibility she needed to
make another trial payment, which she did.  This was confirmed when, on December 7, 2009,
SMSI sent her a letter directing her to continue making trial payments for another two months.
Only four days after that letter, SMSI sent, and Rak executed, the HAMP loan modification,
which applied *retroactively* to December 1.  Again, Rak could reasonably have believed she was
not required to make a second December payment on top of the trial payment she already
tendered for December, but would receive new payment instructions when her HAMP
modification was finalized.  However, under SMSI's logic, Rak was not only required to make a
December 2009 trial payment, but was supposed to make an entirely separate payment, in the
new HAMP amount, that also applied to December 2009, and she was apparently supposed to
make it by December 1, 2009, even though no HAMP modification had been executed at that
point.  This position is untenable.

19

> When Saxon and Ocwen repeatedly ignored my written requests for correction or explanation, I was extremely frustrated and terrified that I could lose my home when I followed all the rules and made all the payments on time.
>
> I am still emotionally drained from having to deal with Saxon and Ocwen failing to sit down with my letters, look at the explanation and respond. I am still terrified of the very real threat of losing my home; this is, in part, directly related to the Defendants' unwillingness to look at the situation I set forth in my letters and respond with explanation and correction.

(Plf. Resp. Ex. Y ¶¶18-20).  These allegations and averments are sufficient to at least create a genuine issue of fact as to the existence and/or amount of Rak's potential damages.

A comparison of two recent cases in this Circuit is instructive here.  In the recent case of *Houston v. U.S. Bank Home Mortgage Wisconsin Servs.*, 505 Fed. Appx. 543 (6th Cir. 2012), the Sixth Circuit reversed a district court's grant of summary judgment on the plaintiff's RESPA claim, in part, on the issue of non-economic damages.  There, the plaintiff had alleged that the defendant's violation of RESPA had resulted in a foreclosure on her home.  *Id.* at 546.  She also alleged emotional damages and averred that she suffered "stress, mental anguish, embarrassment, and humiliation" from the defendant's RESPA violation, and not just as a result of the foreclosure.  *Id.* at 548.  The district court granted the defendant's motion for summary judgment, finding no connection between the plaintiff's alleged damages and her foreclosure, as any connection had been broken by her failure to pay her mortgage.  *Id.* at 546.  The Sixth Circuit agreed on that point, but reversed for a determination of possible emotional damages, which was not addressed by the district court.  *Id.* at 548.  The Sixth Circuit reviewed the plaintiff's allegations and averments of damage, which she specifically tied to the defendant's RESPA violation, and held "that there is a genuine issue of material fact as to whether Houston suffered damages as a result of US Bank's RESPA violation.  Accordingly, we remand for a determination of what damages, if any, can fairly be traced to US bank's RESPA violation."  *Id.*

20

Contrast the case of *Dunn-Mason v. JP Morgan Chase Bank Nat'l Ass'n.*, No. 11-13419, 2013 U.S. Dist. LEXIS 157702 (E.D. Mich. Sept. 25, 2013) *adopted by* 2013 U.S. Dist. LEXIS 156694 (E.D. Mich. Nov. 1, 2013). In that case, plaintiff's complaint alleged "actual damages consisting of emotional distress, nervousness, grief, embarrassment, lost [sic] of sleep, anxiety, worry, mortification, shock, humiliation, indignity, pain and suffering, monetary damages, and loss of our personal residence and serious health conditions centered around stressful daily life conditions. *All caused by the fraudulent foreclosure sale of our home*." *Id.* at *32. The court dismissed plaintiff's complaint, finding that the defendant had complied with RESPA. *Id.* at *30-31. In dicta, the court also noted that plaintiff's allegations of damages were not tied specifically to the RESPA violation, but were the same for every alleged cause of action in her complaint. *Id.* at *31-34. Furthermore, the court found those allegations conclusory, with no supporting facts regarding how she was damaged by the RESPA violation as opposed to the foreclosure itself. *Id.* at *33-34.

The Court finds that Rak's case is much more analogous to *Houston* than to *Dunn-Mason*. Here, as in *Houston*, Rak has alleged non-economic damages in her complaint specific to SMSI's RESPA violation. Similarly, as in *Houston*, Rak has averred that she has suffered frustration, emotional distress and fear of losing her home as a direct result of the RESPA violation, *i.e.*, SMSI's (and Ocwen's) failure to properly respond to her April 17, 2012 QWR. Drawing, as the Court must, all inferences in Rak's favor, a reasonable inference can be made that had SMSI accepted Rak's correspondence as a QWR and investigated its allegations, it may have detected the mistaken application of her $96.73 payment and rectified her account statement as it existed in SMSI's files. This may have also required SMSI to alter the documents that it had already sent to Ocwen, and may have alleviated some of the problems that arose with

Rak's relationship with that servicer.  While the nexus between SMSI's conduct and Rak's damages is complicated by the fact that the QWR was sent and responded to after SMSI transferred the loan and allegedly breached the HAMP agreement (resulting in Ocwen's application of all of Rak's payments to late fees and interest), given the Sixth Circuit's broad statements regarding causation under RESPA, the Court nevertheless finds a sufficient causal link exists between SMSI's failure to properly investigate and respond to Rak's April 2012 QWR and the non-economic damages she alleges and avers she suffered as a result.  Moreover, the Court does not find it at all a stretch that the circumstances Rak faced – being advised by a new servicer (based on information provided by the old servicer who had made prior accounting errors on her account) that she had not made her mortgage payment in years, and then not having the matter promptly corrected – would cause any borrower to suffer the type of non-economic damage she alleges.  At a minimum, it raises a question of fact that a jury should decide.  Accordingly, the Court recommends denying SMSI's motion for summary judgment regarding Rak's April 17, 2012 QWR.

## III.  CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that SMSI's Motion for Summary Judgment **[29]** be **GRANTED IN PART** as to the qualified written requests of June 2011 and January 2012, but **DENIED IN PART** regarding the qualified written request of April 17, 2012.


Dated: January 9, 2014                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


## <u>NOTICE TO THE PARTIES REGADING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.   A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).   Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

Dated:  January 9, 2014